Jerry VALDIVIA, Alfred Yancy, and Hossie Welch, on their own behalf and on behalf of the class of all persons similarly situated, Plaintiffs,

v.

Gray DAVIS, Governor of the State of California, et al., Defendants.

No. CIV. S–94–671 LKK/GGH.

United States District Court, E.D. California.

June 14, 2002.

Karen Kennard, McCutcheon, Doyle, Brown & Enerson, San Francisco, CA, for plaintiffs.

William Cashdollar, Deputy Atty. Gen., Sacramento, CA, for defendants.

## *ORDER*

KARLTON, Senior District Judge.

Plaintiffs sue the Governor of the State of California, and various state correctional officials for allegedly maintaining parole revocation procedures which violate the Due Process Clause of the Fourteenth Amendment.[1] Plaintiffs now move for partial summary judgment on their claim that the State's unitary parole revocation hearing system is unconstitutional.[2] I resolve the matter on the pleadings and evidence filed herein and after oral argument.

## I.

### FACTS [3]

Under California's system, a parole officer can impose a hold if the officer concludes that there is reasonable cause to believe the parolee has violated a condition of his parole and is a danger to himself, a danger to the person or property of anoth-

---

1. Previously the court certified a class consisting of California parolees (1) who are at large; (2) who are in custody as alleged parole violators awaiting revocation of their parole status; or (3) who are in custody having been found in violation of parole.

2. By "unitary," the court means that the sole hearing accorded a parolee is directed to disposition of the alleged violation without a preliminary determination of probable cause.

3. The facts contained herein are undisputed unless otherwise noted.

er, or may abscond. A parole hold authorizes the detention of a parolee charged with an alleged parole violation pending a parole revocation hearing. The parole officer is not required to obtain an arrest warrant prior to placing the hold and taking the parolee into custody. Within seven days after detention pursuant to the parole hold, the parolee must be notified of the reasons for the hold.

As noted, California's process does not provide for a preliminary revocation hearing to determine whether there is probable cause to believe that a parolee committed a parole violation. Rather, California has adopted a wholly internal review system from which the parolee is entirely excluded. Following the placement hold, the parole officer has a case conference with the unit supervisor to review the decision to place the hold, and to determine a possible disposition. Thereafter, the parole officer prepares and files a parole violation report which is, after review by the unit supervisor, submitted to the Board of Prison Terms. The report contains information on the alleged parole violation and supporting evidence, a summary of the parolee's adjustment while on parole, and a recommendation as to what action should be taken.

Based on the parole violation report, a Board of Prison Terms' deputy commissioner determines the terms of a "screening offer" to be presented to the parolee. A "screening offer" tenders to the parolee a specific term of incarceration in exchange for the disposition of the case and a

waiver of the parolee's right to have a revocation hearing.[4] When the deputy commissioner reviews the parole violation report to determine the appropriate screening offer, the parolee is neither present, nor has he had any opportunity to communicate with the deputy commissioner. Put directly, at no time prior to the determination of the screening offer has the parolee been given an opportunity to speak to the charges, challenge the contents of the violation report, present his own evidence, or to question witnesses.

If the parolee accepts the screening offer, a revocation hearing is not held and thus the parolee has no chance to challenge either the parole hold or the charges. If the parolee does not accept the screening offer, a formal revocation hearing is scheduled where the parolee may then challenge the charge leading to the hold, rather than the parole hold. Pending the revocation hearing, parolees who are under a parole hold remain in custody.

In sum, at no time prior to the unitary revocation hearing, do parolees have an opportunity to present their position to an independent decision-maker or to challenge, in any manner, whether the parole officer had probable cause for the parole hold and resulting detention.

California's regulations suggest that the unitary revocation hearing for parole revocation be scheduled within forty-five days from the date the parole hold is placed. This forty-five day period is only advisory, See Cal.Code Regs. tit. 15, § 2640(f),[5] and

---

**4.** The screening offer has the benefit to the parolee of providing a definite resolution of the alleged violation, which ordinarily is less severe than the potential sentence following a revocation hearing. Thus, the screening offer system presents a parolee who has not engaged in the charged conduct an inducement to, in effect, enter an "Alford" plea, i.e. admit to the charge in order to avoid a more severe

consequence. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**5.** The regulations provide that "these time limits are directory and do not affect the board's jurisdiction to hold a revocation hearing in the event of delay which does not

can be extended if defendants determine a delay does not prejudice the parolee. *Id.*[6] The average hold to revocation hearing time statewide is 35.2 days.[7]

## II.

### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Owens v. Local No. 169,* 971 F.2d 347, 355 (9th Cir.1992).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

---

prejudice the parolee." Cal Code Regs. tit. 15, § 2640(a).

**6.** It is undisputed that approximately ten percent of all revocation hearings take place in more than forty-five days. *See* Defendants' Statement of Undisputed Facts, at No. 1.

**7.** As of March 2001, the average hold to revocation hearing time in the State was 35.2 days. *See* Plaintiffs' Undisputed Facts, at No. 23. Specifically, the State's regional averages with respect to this time lapse are as follows: Region I—38.8 days, Region II—36.2 days, Region III—37.7 days, and Region IV—28.8 days. *See* Plaintiffs' Undisputed Facts, at Nos. 19–22. As of May 2001, sixty-four percent of parolees alleged to have violated a condition of their parole had a hold to revocation hearing time of thirty-one to forty-five days. *See* Plaintiffs' Undisputed Facts, at No. 28. Specifically, the State's regional percentages of parolees who had their revocation hearings between thirty-one and forty-five days are as follows: Region I—79.6%, Region II—93.7%, Region III—92.9%, and Region IV—33.1%. *See* Plaintiffs' Undisputed Facts, at Nos. 24–27.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *see also Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 290, 88 S.Ct. 1575; *see also T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *see also SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). The evidence of the opposing party is to be believed, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)); *see also Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## III.

## PROCEDURAL DUE PROCESS

### A. FRAMEWORK FOR ANALYSIS

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court established a three step balancing test to resolve procedural due process claims. While *Mathews* did not involve claims arising in a parole context, that fact does not appear significant. In-

deed, procedural due process jurisprudence appears to employ the same three part test irrespective of the context in which the claim arises. *See Greenholtz v. Inmates, Nebraska Penal & Correctional Complex,* 442 U.S. 1, 18, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).[8] Of course to recognize that the same standard applies, is not to say that context is irrelevant. On the contrary, as explained below, context is one of the elements to be considered in arriving at a conclusion as to what process is due. I turn to the three part test.

■ The first criteria in assessing the process due is the value of the liberty interest and the degree of potential deprivation. *See Mathews,* 424 U.S. at 341, 96 S.Ct. 893. (citing *Morrissey,* 408 U.S. 471, 92 S.Ct. 2593). As the Court in *Morrissey* noted, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by the governmental action." *Morrissey,* 408 U.S. at 481, 92 S.Ct. 2593 (quoting *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). After identifying

the nature of the right at issue, the court must consider "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards." *Mathews,* 424 U.S. at 343, 96 S.Ct. 893. Finally, the court must consider the administrative burden and other societal costs, or benefits, which might be associated with requiring more process as a matter of constitutional law. *Id.* at 347, 96 S.Ct. 893.

■ As *Morrissey* noted, the liberty interest at stake in cases such as the one at bar, is a parolee's interest in retaining the "enduring attachments of normal life" so long as he or she does not violate the conditions of parole. 408 U.S. at 482, 92 S.Ct. 2593.[9] While there may be no constitutional right to parole and while the conditions of parole may significantly restrict a parolee's freedom, it is self-evident that the liberty interest of a parolee is quite significant, and much greater than the liberty interest of a prisoner still confined within the prison system. *See id.*[10] ("Though the State properly subjects [a parolee] to many restrictions not applicable to other citizens, his condition is very different from that of confinement in prison.").[11]

8. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the seminal parole violation case preceded *Mathews.* It cited to *Mathews* "direct ancestors in reaching its conclusions". *See Morrissey,* 408 U.S. at 481, 92 S.Ct. 2593 (citing *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)). Moreover, *Mathews,* while involving a property interest in Social Security disability benefits, cited to cases in the prison context, as well as *Morrissey,* to develop its test for determining the process due before deprivation of a constitutionally protected interest. *See Mathews,* 424 U.S. at 333–34, 96 S.Ct. 893 (citing *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Morrissey,* 408 U.S. at 481, 92 S.Ct. 2593).

9. The Court explained that:
   "Subject to the conditions of his parole, he [the parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life ..."
   *Morrissey,* 408 U.S. at 480, 92 S.Ct. 2593.

10. Just ask any defendant in a criminal trial whether he wants probation or imprisonment.

11. Since the liberty interest of those persons outside the prison is far greater then those who are imprisoned, cases such as *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which involve asserted rights within prison, do not inform what weight is to be

Under the rationale of *Morrissey*, the "fairness and reliability" of the existing procedures should then be measured by determining how effective the procedures are in assuring a factually accurate statement of (1) whether there is probable cause to believe that the parolee violated parole (procedures during preliminary stage), and (2) whether the parolee did in fact violate parole (procedures during revocation hearing). As the High Court explained, "[i]n analyzing what [process] is due, we see two important stages in the typical process of parole revocation ... The first stage occurs when the parolee is arrested and detained, usually at the direction of the parole officer. The second occurs when parole is formally revoked." 408 U.S. at 485, 92 S.Ct. 2593. The first stage is to insure that the parolee's life is not disrupted by an unjustified parol hold, while the second stage requires reliable information justifying the parolee's long term reincarceration. *Id.* Fundamentally, the process due must include procedures which will prevent parole from being revoked because of "erroneous information or because of an erroneous evaluation." *Id.* at 484, 92 S.Ct. 2593.

Of course, as with all due process considerations, the balance which the court strikes in the parole revocation context is informed by an understanding that "due process is flexible and calls for such proce-

dural protections as the particular situation demands." *Id.* at 481, 92 S.Ct. 2593. Put bluntly, however, flexibility is not a shibboleth permitting something less than what the particular situation does demand.

Given all the above, I now consider the process that is due when a parolee's liberty interest is endangered by a claimed violation of the terms of parole.[12]

Plaintiffs assert that California's unitary parole revocation hearing system does not comport with the requirement of the federal constitution's Due Process Clause. In this motion, they contend that the State's failure to conduct preliminary hearings at the time of a parolee's arrest and detention is unconstitutional.

To assess the validity of plaintiffs' claim, the court must first determine whether there is controlling precedent speaking to the particular procedures due at the initial stage of the parole revocation process. Obviously where binding precedent requires particular procedures, the pertinent question is whether defendants are providing those required procedures. In the absence of such controlling precedent, the task is to apply the *Mathews* process to the procedures at issue. As I now observe, the courts by which I am bound have spoken with less than perfect clarity on the issues before me.

accorded the liberty interest at stake in the parole context. *See also Young v. Harper*, 520 U.S. 143, 147–48, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997).

**12.** Defendants appear to suggest that the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1)(A), has altered the values to be balanced requiring the court to afford "substantial weight" to any adverse impact upon public safety or the operation of the criminal justice system. I cannot agree.

By its terms, Section 3626(a)(1)(A) applies to any "civil action with respect to prison conditions." Here, plaintiffs do not challenge

prison conditions. Rather, plaintiffs challenge quite a different subject, parole violation procedures. As noted *supra,* the Supreme Court has long recognized different issues are at stake when addressing parolees as contrasted with those who are imprisoned. *Young v. Harper,* 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997). While considerations of public safety and the impact on the criminal justice system are proper factors to weigh in determining the process due, the weight to be accorded those factors is unaffected by PLRA.

## B. PRE REVOCATION HEARINGS

■ Plaintiffs assert that they are being denied due process because defendants do not afford parolees preliminary hearings to verify the existence of probable cause prior to the revocation hearing. Defendants acknowledge that under California's regulations and the current practice, the Board conducts pre-revocation hearings only when the parolee is suspected of a serious parole violation within thirty days of the parolee's maximum discharge date. *See* Cal.Code Regs. tit. 15, § 2644(a). Otherwise, parolees suspected of parole violations are only afforded a unitary parole revocation hearing, often held within forty-five days of the date the parole hold is placed. Defendants contend, however, that a preliminary hearing is not required, and that the State's unitary parole revocation procedure provides a constitutionally equivalent process. Below, I explain why defendants' arguments are less than persuasive.

In *Morrissey*, the Supreme Court appeared to determine that the Constitution requires a two stage process. 408 U.S. at 485, 92 S.Ct. 2593 ("[W]e see two important stages in the typical process of parole revocation," the first being the "arrest and preliminary hearing" stage, and the second, "when parole is formally revoked."). The Court explained that the initial "inquiry should be seen as in the nature of a 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." *Id.*

The *Morrissey* Court's explanation of the requirements for a preliminary procedure plainly suggests that it contemplated a "hearing" rather than some ex-parte process, for confirming probable cause. For instance, in describing the "preliminary hearing," the Court stated that "the parol-

ee should be given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation." *Id.* at 486–87, 92 S.Ct. 2593. The Court added that "[a]t the hearing, the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer." *Id.* at 487, 92 S.Ct. 2593. Moreover, on request of the parolee, the "person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence." *Id.* Finally, the Court required that the determination of reasonable grounds "should be made by someone not directly involved in the case." *Id.* at 485, 92 S.Ct. 2593.

Despite the fairly detailed description of a constitutionally sufficient preliminary determination, it remains true that the Court has repeatedly taught, and not just in *Morrissey*, that the requisites of due process are flexible. As will be seen, this teaching has suggested to some that *Morrissey* did not command two hearings under all circumstances. As I now explain, that conclusion, while plausible, is difficult to maintain in light of the Supreme Court's next discussion of the issue.

A year after *Morrissey*, the Court explained that in that case "we held that a parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole, and the other a somewhat more comprehensive hearing prior to the making of the final revocation decision." *Gagnon v. Scarpelli,* 411 U.S. 778, 781–82, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *see also id.* at 786, 93 S.Ct. 1756 ("*Morrissey* mandated preliminary and final revocation hearings."). The *Gagnon* Court again empha-

sized that "[a]t the preliminary hearing, a probationer or parolee is entitled to notice of the alleged violations ... an opportunity to appear and to present evidence on his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." 411 U.S. at 786, 93 S.Ct. 1756. Observing no difference between parole revocation and probation revocation, the Court stated that "we hold that a probationer, like a parolee, is entitled to a preliminary and final revocation hearing." *Id.* at 782, 93 S.Ct. 1756.

While it would appear that, without more, *Morrissey* and *Gagnon* are dispositive, this court is also bound by the Ninth Circuit's interpretation of the teachings of the High Court. I thus turn to the Circuit's cases.

Nine years after *Gagnon*, the question of hearings under *Morrissey* was discussed in *Pierre v. Wash. St. Bd. of Prison Terms & Paroles*, 699 F.2d 471 (9th Cir. 1983). There, a habeas petitioner, after having his parole revoked, claimed that the State did not adhere to its own guidelines for determining his minimum prison term. The petitioner also claimed that he was denied due process because the State did not provide him with a preliminary hearing prior to his revocation hearing. On appeal, the petitioner abandoned his claim regarding the preliminary hearing. Nonetheless, after rejecting his claim concerning State guidelines, the Circuit panel stated that "[a]lthough appellant abandoned

his contention that failure to hold a preliminary hearing prior to the formal on-site revocation hearing violated his due process right, we believe the issue is before us." *Pierre*, 699 F.2d at 472.[13] The *Pierre* court then opined that the Supreme Court did not intend to require two hearings in every case, but only in cases with a fact pattern similar to the one before it in *Morrissey*. *See Pierre*, 699 F.2d at 472–73.[14] Emphasizing the language in *Morrissey* abjuring formalism in the revocation process, *Pierre* then declared that "[u]nder the facts of *Morrissey*, the two-hearing system requirement was just one way to satisfy minimum due process; it is not the only way in every case." *Id.* The Circuit panel failed to discuss *Gagnon*'s explanation that in *Morrissey* the Court had held that, indeed, two hearings were required.

At least one way of reading *Pierre* so as to be consistent with *Morrissey*, is to read it as not departing from an obligation to provide a preliminary hearing, but rather, as concluding no more than that a final revocation hearing occurring within twenty-one days of the arrest of a parolee was "prompt enough to qualify as the preliminary probable cause determination required by *Morrissey*." *Pierre*, 699 F.2d at 473. This reading of *Pierre* is supported by subsequent Ninth Circuit cases. In *United States v. Stocks*, 104 F.3d 308 (9th Cir.1997), a panel stated that "[a]fter *Morrissey*, parole may not be revoked unless the parolee is afforded a hearing as to probable cause and a final revocation hearing. At the preliminary parole revocation

---

**13.** Given that anyone may waive a constitutional claim, the *Pierre* court's assertion is indeed puzzling.

**14.** In *Morrissey*, the Court explained the importance of a prompt preliminary hearing noting that because "there is typically a substantial time lag" between arrest and the final revocation determination, and since "it may be that the parolee is arrested at a place

distant" from the place where the final revocation hearing will take place, "due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." 408 U.S. at 485, 92 S.Ct. 2593.

hearing, a parolee is entitled to notice of the alleged parole violations, an opportunity to appear and to present evidence, a conditional right to confront the government's witnesses, an independent decision-maker, and a written report of the hearing." *Id.* at 311; *see also White v. White,* 925 F.2d 287 (9th Cir.1991)(finding that *Morrissey* contemplated both a preliminary and a final revocation hearing).[15]

Whatever else may be said for *Pierre,* it seems apparent it is dicta. Moreover, although this court should pay respectful attention to Circuit dicta, given all the above it would seem the defendants can only rely on *Pierre* if their practice of delaying the revocation hearing roughly between thirty-one and forty-five days meets *Morrissey*'s requirement that there be a prompt determination of probable cause. California's time frame for holding a hearing far exceeds the twenty-one days the *Pierre* panel thought sufficed.[16]

Defendants provide no authority to support the proposition that an average delay of thirty-one to forty-five days is acceptable under *Morrissey* and *Gagnon.*[17] While some state courts have held that a preliminary hearing can occur within thirty days from the date of arrest, *see State v. Myers,* 86 Wash.2d 419, 545 P.2d 538 (1976)(en banc), it does not appear that any court has indicated that a delay of more than thirty days would be justifiable.[18] Indeed, even in *Ellis v. District of Columbia,* 84 F.3d 1413 (D.C.Cir.1996), the D.C. Circuit case on which defendants rely, the policy required the final revocation hearing to occur within thirty days from the date the Board was notified of the execution of a warrant, and regulations mandated a preliminary interview prior to the revocation hearing. *Id.* at 1420.[19]

---

15. In *White* the Ninth Circuit held that the Parole Commission's refusal to allow plaintiff to confront and cross-examine adverse witnesses at his parole revocation hearing violated his right to due process. 925 F.2d at 290. While the case addressed the final revocation hearing, the *White* court examined *Morrissey* in detail and concluded that "[t]o gather the facts necessary to make the two-part decision, the *Morrissey* court contemplated two hearings." *Id.* at 291.

16. Defendants' process may have other problems. As noted, it encourages *Alford* type admissions of violation. *See* n. 4 *supra.* Putting the parolee to such a choice without at least a determination of probable cause may itself raise due process questions. Because the court resolves the instant motion on other, more established grounds, I need not consider that issue further. As I point out in the text, however, the effect of the screening offer in assuring reliable fact-finding bears on the *Mathews* balancing test.

17. While *Pierre* opined that twenty-one days was not inappropriate, the Seventh Circuit has suggested in dicta that a ten day delay may violate *Morrissey. See Luther v. Molina,* 627 F.2d 71, 75, n. 3 (7th Cir.1980)("Chief Justice Berger [in *Morrissey*] seemed to be

contemplating an almost immediate hearing.... It is possible that a ten day delay between detention and the preliminary hearing does not meet ... constitutional ... requirements.").

18. It may be of some interest that the United States Senate has noted relative to preliminary hearings in the federal parole system, that a two-day detainment could result in a loss of employment and severe disruption of the reintegration effort. *See* S.Rep. No. 369, 94th Cong., 1st Sess. 25–26 (1975), *reprinted in* 1976 U.S.C.C.A.N. 335, 347, *cited in Ellis v. District of Columbia,* 84 F.3d 1413, 1430 (D.C.Cir.1996).

19. The majority in *Ellis,* like *Pierre,* emphasized the flexible nature of due process and distinguished the facts in the District of Columbia from those in *Morrissey.* As the dissent pointed out, however, that reasoning fails to come to grips with *Gagnon*'s explanation that two hearings are required by *Morrissey. See Ellis,* 84 F.3d at 1429–30 (J. Tatel, dissenting). While the majority relied on the footnote in *Gagnon* encouraging the States to devise "creative solutions" to cope with the practical difficulties of complying with *Morrissey, Ellis,* 84 F.3d at 1422 (citing *Gagnon,*

Given all the above, this court concludes that even if a prompt unitary hearing would meet constitutional muster, a question I need not resolve, California's system allowing a delay of up to forty-five days or more before providing the parolee an opportunity to be heard regarding the reliability of the probable cause determination does not.

Again, even assuming that *Morrissey* and *Gagnon* do not compel a prompt preliminary hearing, the court's conclusion above is necessitated by application of the *Mathews* test. In order to protect a parolee's liberty interest, *Morrissey* requires procedures to insure not only that the State does not revoke parole without an adequate factual basis, but that parolees are not detained without some sort of assurance that there is probable cause to suspect a parole violation. The effect of detention itself, in its disruption of the parolee's family relationship, job, and life, is sufficiently significant to require such a procedure.

Moreover, it is clear that the screening offer procedure places a severe strain on an accurate fact-finding process. While, clearly, *Alford* pleas do not offend the Constitution, and indeed frequently benefit the parolee, that is not the issue in terms of the three part balancing test. In that context, the issue is whether greater process produces a more reliable result. Certainly when a probable cause determination has been made, society can have greater confidence that the screening offer has not produced an unreliable result.

Finally, of course, the court must balance the social interest in protecting an individual's interest in remaining at large with the State's interest in protecting the public from parolees who have violated the conditions of their parole. In seeking to weigh that interest, however, the court is handicapped, since the defendants offer no evidence for the proposition that a delay of thirty-one to forty-five days is necessary to insure protection of that interest. Moreover, while administrative inconvenience is a proper *Mathews* consideration, the inconvenience occasioned by a prompt probable cause hearing would not appear to be, in and of itself, a sufficient justification for the potentially catastrophic consequences of delay. Indeed, the Supreme Court seems to view with equanimity the inconvenience that *Morrissey* engendered. *See Gagnon*, 411 U.S. at 782, n. 5, 93 S.Ct. 1756 ("[s]ome amount of disruption inevitably attends any new constitutional ruling.").

For all the above reasons, the court concludes that whether viewed as compelled by *Morrissey*, or the result of a *Mathews* balancing test, the current California parole revocation system violates the plaintiffs' due process rights.

## IV.

### ORDERS

Accordingly, plaintiffs' motion for partial summary judgment is GRANTED.

IT IS SO ORDERED.

411 U.S. at 782, n. 5, 93 S.Ct. 1756), that cannot reasonably be construed as an invitation to avoid the fundamental requirements of *Morrissey*. Whatever "creative solutions" or flexibility the Due Process Clause permits, it would appear that the Supreme Court has so far done nothing to indicate a retreat from its previous position. Finally, for what it is worth, California's situation far more clearly resembles that found in *Morrissey* rather than the situation in the District of Columbia. In sum, then, with all due respect, I do not find *Ellis* helpful in resolving the issue before this court.