Jerry VALDIVIA, Alfred Yancy, and Hossie Welch, on their own behalf and on behalf of the class of all persons similarly situated, Plaintiffs,

v.

Edmund G. BROWN, Jr., Governor of the State of California, et al., Defendants.

No. CIV. S–94–671 LKK/GGH.

United States District Court, E.D. California.

July 3, 2013.

Order on Reconsideration in Part Sept. 11, 2013.

Andrea M. Miller, Nageley Meredith and Miller Incorporated (Sacramento), Sacramento, CA, Alexander L. Landon, Law Offices of Alex Landon, San Diego, CA, Donald Specter, Prison Law Office, Berkeley, CA, Ernest Galvan, Gay Crosthwait Grunfeld, Holly Macleish Baldwin, Michael Bien, Shirley Huey, Rosen Bien Galvan & Grunfeld LLP, Geoffrey Thomas Holtz, Kristen A. Palumbo, Bingham McCutchen LLP, Susan Lynn Burrell, San Francisco, CA, for Plaintiffs.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

In 1994, plaintiffs commenced this action, which challenged the constitutionality of California's then-existing parole revocation system. In 2011, California began enacting legislation, commonly known as "Realignment," that significantly altered the state's criminal justice system. The question before this court is whether, in light of Realignment, this lawsuit remains the proper vehicle for ensuring that parolees receive Constitutionally-guaranteed due process protections. Having carefully considered the question, the court concludes that this case became moot as of

July 1, 2013, when the new parole revocation system was scheduled to go fully into effect. Accordingly, for the reasons set forth below, the plaintiff class will be decertified and this matter dismissed.

## I. BACKGROUND

### A. History of the litigation

On May 2, 1994, plaintiffs filed the instant lawsuit, challenging California's parole revocation procedures under the Fourteenth Amendment. Plaintiffs' initial complaint alleged that "[t]he Defendants and by and through the Department of Corrections ... continue a practice of revocation of parole and remand of parolees, in violation of law as alleged herein, which practice has been continuing for many years." (Complaint ¶ 48, ECF No. 1.) Class certification was sought on the grounds that "[i]n general, the common questions of law and fact involve the summary remand to prison of parolees without due consideration of the right to counsel and without due process of law, in violation of *Gagnon v. Scarpelli*, [411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)] and *Morrissey v. Brewer*, [408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)]." (*Id.* ¶ 58.)

On December 1, 1994, the court certified a plaintiff class consisting of California parolees (1) who are at large; (2) who are in custody as alleged parole violators awaiting revocation of their parole status; or (3) who are in custody having been found in violation of parole. (Order, ECF No. 76)

The parties engaged in discovery for several years thereafter. On June 13, 2002, the court granted partial summary judgment in favor of plaintiffs, finding that California's parole revocation hearing system failed to safeguard plaintiffs' procedural due process rights under *Morrissey*, 408 U.S. at 487–90, 92 S.Ct. 2593, and *Gagnon*, 411 U.S. at 786, 93 S.Ct. 1756.

The court's order emphasized that, in order to ensure adequate due process, probable cause hearings must be both accurate and promptly-held. *See Valdivia v. Davis*, 206 F.Supp.2d 1068 (E.D.Cal.2002).

Four months later, the court ordered defendants to file a proposed remedial plan to address identified due process violations. The court also directed the parties to meet and confer so that defendants could adapt the proposed remedial plan into a proposed remedial order to be presented to the court. (Order, Oct. 18, 2002, ECF No. 742.)

After some delay, defendants filed a proposed remedial plan, to which plaintiffs objected. (ECF No. 784.) At the hearing on plaintiff's objections, defendants indicated "that they would appreciate guidance from the court on precisely what the Constitution requires with respect to the timing and substance of the preliminary parole revocation hearing." (Order at 3, July 23, 2003, ECF No. 796.) In a subsequent order, the court initially expressed its hesitation at so doing, in light of the principle that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593. Nevertheless, in order to facilitate the development of an adequate remedy, the court undertook a comprehensive review of the case law surrounding the promptness of probable cause hearings in the parole context, as well as in the context of other constitutional deprivations, and advised as follows:

[A] period of ten days strikes a reasonable balance between inevitable administrative delays and the state's interest in conducting its parole system, on the one hand, and the liberty interests of parolees, on the other. I conclude that the Constitution simply does not tolerate the state's detaining parolees for over ten days, with all the attendant disruptions

such detention entails, without affording a preliminary hearing to determine whether there is probable cause for the detention. (*Id.* at 13.) [1]

The court then set forth the following minimum standards for probable cause hearings: that they be conducted by a neutral decisionmaker, that parolees have an opportunity to both present documentary evidence and witnesses, and to cross-examine adverse witnesses, and that the hearing's results be documented in a written report. Alternatively, defendants could hold a unified hearing that was sufficiently prompt and the content of which met the due process requirements for both probable cause and revocation hearings. (*Id.* at 15–16.)

Ultimately, the parties filed a stipulated order for permanent injunctive relief, which the court entered. (Order, March 8, 2004 ("Injunction"), ECF No. 1034.) The parties to the Injunction were the previously-certified plaintiff class and "the [defendant] state officials responsible for the policies and procedures by which California conducts parole revocation proceedings." (Injunction ¶ 8.) All of these defendants were members of the state's executive branch. Critical provisions of the Injunction include:

1. Notice of charges and rights, to be served on parolees not later than three business days from the placement of a parole hold. (Injunction ¶ 11(b)(iii).)

2. Probable cause hearings, to be held no later than 10 business days after parolees are served notice of charges and rights. (Injunction ¶ 11(d).)

3. Appointment of counsel for all parolees at the beginning of the Return to Custody Assessment [2] stage of the revocation proceedings. (Injunction ¶ 11(b)(i).)

4. Expedited probable cause hearings, if appointed counsel makes a sufficient offer of proof of a complete defense to all parole violation charges. (Injunction ¶ 11(b)(i).)

5. The ability of parolees' counsel to subpoena and present witnesses and evidence to the same extent and under the same terms as the state. (Injunction ¶ 21.)

6. Adequate allowance, at probable cause hearings, for parolees to present evidence to defend or mitigate against the charges and proposed disposition. Such evidence may be presented through documentary evidence or through the charged parolee's testimony, either or both of which may include hearsay testimony. (Injunction ¶ 22.)

---

**1.** It *absolutely* does not follow from this determination that detention for periods of ten days or less, without notice and a preliminary hearing, is constitutionally adequate in all circumstances. The ten day limit was a highly context-specific determination; per *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593, it was the level of "procedural protections as the particular situation demand[ed]." The principal consideration in determining whether notice and hearing is sufficiently timely is that "[t]he effect of detention itself, in its disruption of the parolee's family relationship, job, and life, is sufficiently significant [so as] to require" procedural due process safeguards. *Valdivia,* 206 F.Supp.2d at 1078. "The process due must include procedures which will prevent parole from being revoked because of 'erroneous information or because of an erroneous evaluation.' " *Id.* at 1074 (quoting *Morrissey,* 408 U.S. at 484, 92 S.Ct. 2593).

**2.** "Return to Custody Assessment" refers to "the practice by which Defendants offer a parolee a specific disposition in return for a waiver of the parolee's right to a preliminary or final revocation hearing, or both." (Injunction ¶ 9(d).)

7. Limitations on the use of hearsay evidence at hearing in light of parolees' confrontation rights, as provided for in *United States v. Comito,* 177 F.3d 1166 (9th Cir.1999). (Injunction ¶ 24.)

8. Parole revocation hearings to be held no later than 35 calendar days from the date of placement of a parole hold. (Injunction ¶¶ 11(b)(iv), 23.)

The Injunction also addressed topics such as provision of assistance for parolees with communicative or cognitive impairments, training of appointed counsel, and the handling of confidential information. The Injunction does not specify an end date for court supervision, providing instead that "[t]he Court shall retain jurisdiction to enforce the terms of this Order. The Court shall have the power to enforce [these terms] through specific performance and all other remedies permitted by law or equity." (Injunction ¶ 28.)

Defendants subsequently moved, successfully, for the appointment of a Special Master, and on December 16, 2005, the court appointed Chase Riveland to that position. (ECF Nos. 1198, 1213, 1245.) The Special Master has subsequently filed thirteen reports with the court addressing implementation of the *Valdivia* Injunction, as well as the court's subsequent orders herein. (ECF Nos. 1302, 1335, 1388, 1479, 1483, 1539, 1570, 1585, 1647, 1730, 1750, 1783.) [3]

**B. Proposition 9**

On November 4, 2008, California voters passed Proposition 9, entitled "Victims' Bill of Rights Act of 2008: Marsy's Law." Proposition 9's amendments to the California Penal Code altered a number of the parameters for the parole revocation system that had been mandated by the Injunction. Plaintiffs moved to enjoin enforcement of portions of Penal Code § 3044 (enacted by Prop. 9) as conflicting with provisions of the Injunction; defendants cross-moved to modify the Injunction to conform to Proposition 9. *Valdivia v. Schwarzenegger,* 603 F.Supp.2d 1275 (E.D.Cal.2009). After hearing, the court denied defendants' motion, and granted plaintiffs' motion in substantial part. *Id.* On appeal, the Ninth Circuit held that the court had erred by failing to make an "express determination that any aspect of the California parole revocation procedures, as modified by Proposition 9, violated constitutional rights, or that the Injunction was necessary to remedy a constitutional violation...." *Valdivia v. Schwarzenegger,* 599 F.3d 984, 995 (9th Cir.2010). On remand, the court determined that the following aspects of Cal.Penal Code § 3044, as enacted by Section 5.3 of Proposition 9, were unconstitutional:

(1) Holding probable cause hearings no later than 15 days after the parolee's arrest for parole violations "did not guarantee a prompt probable cause hearing with all of the minimum process set forth in *Morrissey.*" *Valdivia v. Brown,* No. S–94–671–LKK–GGH, 2012 WL 219342 at *6, 2012 U.S. Dist. LEXIS 8092 at *21 (E.D.Cal. Jan. 24, 2012).

(2) Providing parolees with counsel on a case-by-case basis, and even then, only for those parolees who were both indigent and "incapable of speaking effectively in [their] own defense," both "deprived [parolees] of the right to notice of the right to counsel" and failed, under *Gagnon,* to provide for "a presumptive right to counsel when the parolee makes a colorable claim that he has not committed the alleged violations or claims colorable mitigation." *Id.,* 2012 WL 219342 at *8, 2012 U.S. Dist. LEXIS 8092 at *26. The court also found that

**3.** The Special Master's Ninth Report does not appear to have been docketed.

¶ 11(b)(i) of the Injunction, under which all parolees are appointed counsel beginning at the Return to Custody Assessment stage, "is a properly tailored remedy . . . [which] addresses and relates to a Constitutional violation[.]" *Id.*, 2012 WL 219342 at *9, 2012 U.S. Dist. LEXIS 8092 at *28.

(3) Modifying the decision criteria for the Board of Parole Hearings ("BPH"), *e.g.*, by "entrust[ing]" BPH "with the safety of victims and the public" and including requirements that BPH "not be influenced by or weigh the state cost or burden associated with just decisions," was unconstitutional under *Morrissey* in its violation of parolees' right to a neutral decisionmaker, and under *Brown v. Plata*, —— U.S. ——, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011) in its interference with California's constitutionally-mandated efforts to reduce its prison population. *Id.*, 2012 WL 219342 at *10, 2012 U.S. Dist. LEXIS 8092 at *31–32.

(4) Finally, allowing the unconditional use of hearsay evidence in parole revocation hearings was unconstitutional, as it did not permit the balancing of "the releasee's interest in his constitutionally guaranteed right to confrontation against the Government's good cause for denying it." *Id.*, 2012 WL 219342 at *11, 2012 U.S. Dist. LEXIS 8092 at *34 (quoting *Comito*, 177 F.3d at 1170 (9th Cir.1999)).

The court ultimately granted plaintiffs' motion to enforce the Injunction, though it did modify its terms to specify, consonant with Proposition 9, that parole revocation hearings were to be held no later than 45 days after placement of the parole hold. *Id.*, 2012 WL 219342 at *12, 2012 U.S. Dist. LEXIS 8092 at *39.

## C. Realignment

From the inception of this lawsuit until the present, the California Department of Corrections and Rehabilitation ("CDCR") has been largely responsible for the parole system's functioning. BPH, a board operating under the auspices of CDCR, has been responsible for conducting probable cause and parole revocation hearings, and for functions such as issuing arrest warrants for suspected parole violators. CDCR's Division of Adult Parole Operations ("DAPO") has overseen much of the rest of the parole system.

This system began to change on April 4, 2011, when the Governor signed Assembly Bill 109, entitled "The 2011 Realignment Legislation Addressing Public Safety."[4] AB 109, *inter alia,* transferred substantial responsibilities for the parole system to county authorities, and called for state courts "to perform various parole-related functions, including . . . conducting parole discharge, retention, and revocation proceedings[,] and modifying terms and conditions of parole. . . ." (Memorandum from Administrative Office of the Courts, May 20, 2011, Decl. Ernest Galvan, Ex. 2 at 4, ECF No. 1829–3.) Subsequent legislative enactments[5] have narrowed the state courts' role to conducting parole revocation proceedings, and have clarified the counties' and the state's respective responsibilities in the post-Realignment parole system. Briefly, beginning on July 1, 2013, this system is expected to function as set out below.

DAPO will supervise the parole of individuals convicted of any of the following: (1) serious felonies (as described in Cal.Penal Code § 1192. 7(c)), (2) violent felonies

---

4. Cal. Stats. 2011, ch. 15.

5. *See, e.g.,* AB 117, Cal. Stats.2011, ch. 39; AB 116, Cal. Stats. 2011, ch. 136; AB 17, Cal. Stats. 2011–2012, 1st Ex. Sess., ch. 12; AB 1470, Cal. Stats.2012, Ch. 24; SB 1144, Cal. Stats. 2012, ch. 867; SB 1023, Cal. Stats. 2012, ch. 43.

(as described in Cal.Penal Code § 667.5), (3) "third strikes," (4) crimes where the person is classified as a High Risk Sex Offender, and (5) crimes where the person is required, as a condition of parole, to undergo treatment by the Department of Mental Health. Cal.Penal Code § 3000.08(a).[6] DAPO will also continue to supervise parolees who were under its supervision prior to July 1, 2013. State courts will be responsible for hearing petitions for parole revocation and imposing parole terms for these individuals. Individuals paroled from life terms in prison will also be under DAPO supervision, and subject to the jurisdiction of BPH for purposes of parole revocation hearings. Cal.Penal Code. § 3000.1.[7]

All other individuals subject to parole will be released to Postrelease Community Supervision ("PRCS"), to be supervised by county probation departments. Cal.Penal Code § 3000.08(b). Those prisoners who were sent to county jails to complete their terms in the initial stage of Realignment (which began on October 1, 2011) are similarly subject to PRCS, rather than DAPO parole supervision. (Viera Rose Decl. ¶ 6., ECF No. 1825.) The parties appear to

agree that individuals subject to PRCS should not be considered part of the *Valdivia* class.[8] For convenience, the court will use the term "parolee" hereinafter to refer to those individuals subject to DAPO supervision after July 1.

If DAPO suspects a parolee of having violated the terms and conditions of parole, it may do one of the following:

(1) Return the parolee to custody without a warrant (*i.e.*, place a "parole hold" on the parolee). Cal.Penal Code §§ 1203.2(a), 3000.08(c), 3056; or

(2) Seek a warrant from the state court for the parolee to be returned to custody. Cal.Penal Code §§ 1203.2(a), 3000(b)(9)(A), 3000.08(c). The state court has the authority to summarily revoke parole at this stage. Cal.Penal Code § 1203.2(a).

Once a parolee is in custody, DAPO determines whether there is probable cause to believe "that [he or she] has committed a violation of law or violated his or her conditions of parole." Cal.Penal Code § 3000.08(d). If it so finds, DAPO may either apply intermediate sanctions (including "flash incarceration")[9,10] without

---

6. All citations to Cal.Penal Code § 3000.08 are to the version operative on July 1, 2013.

7. The parties have long disputed whether so-called "lifers" are members of the *Valdivia* class. The court has never been called upon to decide this issue, and finds it unnecessary to do so herein.

8. Defendants explicitly assert that "[i]ndividuals released to PRCS are not parolees." (Defendants' Opening 2, ECF No. 1824.) Plaintiffs implicitly concede this point, as their briefing addresses those elements of the parole revocation process that remain under the jurisdiction of DAPO and/or BPH.

9. Cal.Penal Code § 3000.08(e) defines "flash incarceration" as "a period of detention in county jail due to a violation of a parolee's conditions of parole. The length of the detention period can range between one and 10

consecutive days." The statute also provides that "[s]horter, but if necessary more frequent, periods of detention for violations of a parolee's conditions of parole shall appropriately punish a parolee while preventing the disruption in a work or home establishment that typically arises from longer periods of detention." *Id.*

10. Guillermo Viera Rosa, DAPO's Acting Associate Director, avers that, "Despite DAPO's authority to impose terms of flash incarceration upon parolees under its supervision on or after July 1, 2013, DAPO will not utilize flash incarceration pursuant to Penal Code sections 3000.08 and 1203.2(g)." (Viera Rosa Decl. ¶ 9, ECF No. 1825.) Plaintiffs attack this averment on the grounds that it is insufficient as a matter of law to foreclose the use of flash incarceration; as no legislation prohibits DAPO's use of the sanction, DAPO could use it at any time. *See Bell v. City of Boise*, 709

involvement of the state court, or apply to the state court for parole revocation. Cal.Penal Code § 3000.08(d–f). Before seeking parole revocation, DAPO must determine that intermediate sanctions are "not appropriate" for the parolee. Cal.Penal Code § 3000.08(f).

DAPO initiates the parole revocation process by filing a petition with the state court, which must include "a written report that contains additional information regarding the petition, including the relevant terms and conditions of parole, the circumstances of the alleged underlying violation, the history and background of the parolee, and any recommendations." *Id.* The parolee must be "informed of his or her right to consult with counsel, and if indigent the right to secure court appointed counsel." Cal.Penal Code § 1203.2(b)(2). While a hearing on the petition is pending, "a parolee may waive, in writing, his or her right to counsel, admit the parole violation, waive a court hearing, and accept the proposed parole modification or revocation." Cal.Penal Code § 3000.08(f); *see also* Cal.Penal Code § 1203.2(b)(2) ("Upon the agreement by the supervised person in writing to the specific terms of a modification or termination of a specific term of supervision, any requirement that the supervised person make a personal appearance in court for the purpose of a modification or termination shall be waived").

The revocation hearing is to be conducted by the superior court, specifically, a "judge, magistrate, or revocation hearing officer described in Section 71622.5 of the Government Code." Cal.Penal Code § 1203.2(f). The statutory scheme does not prescribe a time frame in which the revocation hearing must be held. Upon

finding that a parolee has violated parole conditions, the court has a number of alternatives, including revoking parole, returning the parolee to parole supervision with a modification of parole conditions (including a period of incarceration), referring the parolee to an evidence-based program such as a reentry court, or placing the parolee under electronic monitoring. Cal.Penal Code §§ 3000.08(f), 3004(a). With certain exceptions, *e.g.,* for individuals previously sentenced to life terms, parolees whose parole is revoked or modified are incarcerated in county jail. Cal.Penal Code §§ 3000.08(f), (h).

BPH's responsibilities after July 1, 2013 include:

- Determining inmate parole eligibility. Cal.Penal Code §§ 3000, 3040.
- For parolees arrested pursuant to warrants issued by BPH before July 1, 2013, reviewing their cases before DAPO may file a petition with the court to revoke their parole. Cal.Penal Code § 3000(b)(9)(B).
- If, at a revocation hearing, the state court determines that a parolee (i) has violated the law or the terms of his/her parole, and (ii) was previously sentenced to an indeterminate life sentence or a determinate sentence for certain sex crimes, BPH (rather than the court) has jurisdiction to determine how long the parolee will be incarcerated. Cal.Penal Code §§ 3000(b)(4), 3000.1, 3000.08(h).

### D. Current Order

Upon initial review, it appeared to the court that the post-Realignment parole revocation system was sufficiently different from the system addressed by *Valdivia* so as to implicate mootness concerns.

F.3d 890 (9th Cir.2013) (holding that voluntary cessation of challenged activity that could be resumed as soon as case is dismissed does not moot plaintiffs' claims for relief).

The court need not weigh Mr. Viera Rosa's declaration, as its decision herein does not rest on whether DAPO has permanently forsworn flash incarceration.

Accordingly, on May 6, 2013, the court issued an order directing the parties to brief the following issues:

> (a) As of July 1, 2013, which elements of the parole system that were formerly the exclusive responsibility of defendants will now be the exclusive responsibility of county authorities and/or the state judiciary?
>
> (b) As of July 1, 2013, which elements of the parole system that were formerly the exclusive responsibility of defendants will now be the shared responsibility of defendants, county authorities, and the state judiciary? What will defendants', county authorities', and the state judiciary's respective responsibilities be as to these shared elements?
>
> (c) Will defendants bear responsibility for elements of the parole system that are newly-created by Realignment, such as "flash incarceration"?
>
> (d) Is *Valdivia* moot as a result of Realignment?
>
> (e) If *Valdivia* is not moot, in what ways should the class definition and/or the Valdivia Remedy be altered to reflect Realignment's changes to the parole system? (Order, ECF No. 1823.)

The parties filed opening briefs on May 28, 2013, and reply briefs on June 11, 2013, together with supporting materials.

Defendants' position is that the post-July 1, 2013 parole revocation system is so different from the prior system as to require the plaintiff class to be decertified, and this case dismissed. Defendants argue for dismissal on the grounds of standing, mootness, and/or abstention.

Plaintiffs counter that significant elements of the parole system remain under defendants' control, and accordingly, the court should continue to enforce those provisions of the Injunction which address paroleees' due process rights prior to revocation hearings conducted by the state courts.

## II. STANDARD

### A. Justiciability vs. the court's equitable powers

 Article III, section 2 of the Constitution limits this court to hearing actual cases and controversies. "An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Alvarez v. Smith,* 558 U.S. 87, 92, 130 S.Ct. 576, 175 L.Ed.2d 447 (2009) (citations and internal quotation omitted). "[A] dispute solely about the meaning of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Id.* at 93, 130 S.Ct. 576.

 Under Federal Rule of Civil Procedure 12(h)(3), "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Accordingly, district courts may *sua sponte* examine justiciability issues such as standing, mootness, and ripeness. See *Bernhardt v. Cnty. of Los Angeles* 279 F.3d 862, 868 (9th Cir.2002) ("The district court had both the power and the duty to raise the adequacy of [plaintiff's] standing sua sponte").

Plaintiffs maintain that it is defendants who bear the responsibility of demonstrating that the Injunction must be modified or terminated, and that they (plaintiffs) must be afforded notice, an opportunity for targeted discovery, and an evidentiary hearing before the court issues a ruling. (Plaintiff's Reply 13–15, ECF No. 1836.) This argument does not lie, given the court's responsibility to determine the ongoing justiciability of this action.[11]

---

**11.** Incidentally, *contra* plaintiffs, there is nothing "improper" about defendants' request that the court decertify the *Valdivia* class and dismiss this case. (Plaintiffs' Reply

The court acknowledges that it has the power to modify a consent decree in order to reflect subsequent legislative enactments. *See, e.g., Railway Employees v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (Harlan, J.) (holding that, in light of amendments to the federal Railway Labor Act that allowed previously-prohibited union shop agreements, district court could modify existing consent decree between non-union employees and railroads). As the Supreme Court observed in *Wright:*

> There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.

*Id.* at 647, 81 S.Ct. 368. *See also United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (Cardozo, J.) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent.... A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need"); *Taylor v. U.S.,* 181 F.3d 1017, 1021 (9th Cir.1999) ("[A] court always possesses the power to revisit continuing prospective orders in light of the evolving factual or legal landscape, and to modify or terminate the relief ...").

Nevertheless, the justiciability inquiry, rooted as it is in Article III of the Constitution, is more fundamental than the court's equitable power to modify a consent decree. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Kentucky Welfare Rights Org.,*

426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

Accordingly, the court must first evaluate whether it retains jurisdiction over the post-Realignment parole revocation system; only if it so finds may it consider equitable modifications to the Injunction.

## B. Standard re: Mootness

The Ninth Circuit has set forth the following standard for determining whether an action for injunctive relief is moot:

> A moot action is one where the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.... The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted. We have pointed out that courts of equity have broad discretion in shaping remedies. Thus, in deciding a mootness issue, the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief.

*Nw. Envtl. Def. Ctr. v. Gordon,* 849 F.2d 1241, 1244–45 (9th Cir.1988) (internal quotations and citations omitted).

■ A case that at one point presented an actual controversy between the parties may become moot due to subsequent statutory enactments. "A statutory change ... is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed." *Native Vill. of Noatak v. Blatchford,* 38 F.3d 1505, 1510 (9th Cir. 1994).

■ The mere possibility that a party may suffer future harm is insufficient to preserve a case or controversy; the threat

13.) The court's May 6, 2013 Order directed

the parties to brief these very questions.

of injury must be "real and immediate," not "conjectural" or "hypothetical." *See City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also City News & Novelty Inc. v. City of Waukesha,* 531 U.S. 278, 283, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001).

### III. Analysis

#### A. Mootness

█ The court begins by noting that Realignment is a comprehensive legislative enactment. While "it is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice[,]' " *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 170, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)), the court cannot discern any voluntary cessation of unlawful conduct of the sort that would generally permit continued jurisdiction. Rather, Realignment appears to be a "statutory change" sufficient to implicate mootness. *Noatak,* 38 F.3d at 1510.

█ Turning to the mootness inquiry, then, "[t]he question is whether there can be any effective relief." *Gordon,* 849 F.2d at 1245. The crux of plaintiffs' argument, in answering this question, is that they "retain a significant interest in their liberty, relationships and connections to their communities, and Defendants retain the ability to endanger those interests based on claimed violations of parole." (Plaintiffs Reply 1.) This may be true. But it is insufficient, as a matter of law, to justify the court's continued jurisdiction over this matter.

Realignment has established a fundamentally different parole system than the one that the *Valdivia* plaintiffs challenged. That system was largely administrative: DAPO supervised parolees; BPH issued warrants for parolees' arrest and adjudicated their probable cause and revocation hearings; upon revocation, CDCR would incarcerate parolees in state prisons. As detailed above, DAPO and BPH's powers and jurisdiction have changed significantly in the new system. For example, DAPO will conduct probable cause determinations (in lieu of BPH's probable cause hearings). Moreover, the system features major new actors (county jails; the California state courts; public defenders' offices) who are not parties to this lawsuit. Further, the plaintiff class is significantly reduced, both in raw numbers and as a matter of law, for many categories of felons previously supervised by DAPO are now subject to Post–Release Community Supervision by county probation departments.

This is not Proposition 9, which tweaked features of the then-existing system by increasing the time for probable cause hearings, limiting parolees' right to counsel, altering BPH's decision criteria at parole hearings, and liberalizing the use of hearsay evidence at these hearings. The court could properly adjudicate the constitutionality of these modifications because Prop. 9 did not change the system of parole revocation itself. The steps in the parole revocation process were the same, the system was still administered by the executive branch through DAPO and BPH, there was no change to the categories of felonies subject to DAPO/BPH jurisdiction, and parolees still returned to state prison when their parole was revoked. None of this is true of the "Realigned" post-July 1, 2013 parole revocation system.

Plaintiffs nevertheless call for the court to retain jurisdiction, arguing, "This is not a case of mootness, but of changed circumstances that require modifications to the injunctive relief that are suitably tailored to the new circumstances, and that do not 'create or perpetuate a constitutional viola-

tion.' " (Plaintiffs' Opening 11 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)), ECF No. 1829.) They contend that "after Realignment, just as before, essentially the entire parole revocation process prior to the final hearing remains under the control and oversight of the defendants," particularly DAPO. (*Id.* 9.) Consequently, plaintiffs warn that "Defendants' plan to abandon [probable cause hearings] would return revocation proceedings to a system that this Court has already expressly deemed unconstitutional." (*Id.* 16.)

In evaluating these arguments, it is instructive to examine how plaintiffs propose that the Injunction ought to be modified to reflect the post-Realignment system. They write:

> Plaintiffs agree that the post-July 1, 2013 revocation system changes will obviate the need for this Court to continue oversight of final revocation hearing-related functions set forth in Injunction paragraphs 20 (final revocation hearing tapes), 21 (parolee access to subpoenas and witnesses at final hearings), 23 [as modified] (45–day deadline for final hearings), and 24 (use of hearsay evidence and confrontation rights at final hearings) and related orders. (Plaintiffs' Reply 12.)

Nevertheless, while plaintiffs concede that "this Court is entitled to presume that the judges of the state court will observe due process in their conduct of final revocation hearings," they go on to request that the identified paragraphs of the Injunction "be modified only as follows: the relief with respect to final revocation hearings should be limited to monitoring by Plaintiffs and the Special Master for the purpose of determining whether the Defendants in this action are interfering with or obstructing the independent performance of due process functions by the state courts." (Plain-

tiffs' Opening 13.) Plaintiffs' proposed order then calls on the court to (i) require defendants to maintain the current system for providing parolees with probable cause hearings ("including the BPH system of hearing officers and the provision of counsel through CalPAP") until such time as any alternate system is approved by this court, (ii) prohibit defendants from imposing "flash incarceration" on *Valdivia* class members until adequate due process protections are approved by the court, (iii) require defendants to submit "policies and procedures to ensure that Defendants continue to make remedial sanctions programs available through and including at the final revocation hearings after such hearings are transitioned to the state courts," and (iv) direct the parties to meet and confer on necessary modifications to the Injunction in light of the court's findings. (ECF No. 1829–31.)

Nothing more clearly demonstrates the mootness of this action than the fact that such extensive measures would be necessary to reconcile the Injunction with the post-July 1, 2013 system. In enacting Realignment, California's legislature has fundamentally altered the structure of the state's parole system. Realignment introduces new actors, adds to and subtracts from defendants' responsibilities, redefines what constitutes a "parolee," and incorporates wholly-new elements such as flash incarceration. The magnitude of the change is significant enough that this court cannot, as plaintiffs suggest, simply identify those components of the old system that recur in the new system, and try to reconcile the Injunction with those components. To do so risks bringing the new system grinding to a halt. Although this court is empowered to modify the Injunction to ameliorate unconstitutional conditions, this power is not a license to jumble together the old and the new in the hopes that a functioning, constitutional system will result. Whether the new system provides

adequate due process must be demonstrated in practice, without untoward judicial interference until the need for intervention is clear.

Moreover, continuing to enforce the Injunction risks intruding on the prerogatives of the state courts. Abstention from unwarranted interference with state court proceedings is a well-settled principle. *See, e.g., O'Shea v. Littleton,* 414 U.S. 488, 500, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris[,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ] and related cases sought to prevent"); *Los Angeles Cnty. Bar Ass'n v. Eu,* 979 F.2d 697, 703 (9th Cir.1992) ("We should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system"); *E.T. v. Cantil–Sakauye,* 682 F.3d 1121, 1124 (2011) ("[T]he district court properly concluded that '[P]laintiffs' challenges to the juvenile dependency court system necessarily require the court to intrude upon the state's administration of its government, and more specifically, its court system'"). Defendants assert that "any due process concerns that arise as a result of DAPO's conduct will be directly reviewed and addressed by the superior courts." (Defendants' Opening 2.) For this court to, *e.g.,* require defendants to maintain the current system for providing parolees with probable cause hearings (including, as plaintiffs request, "the BPH system of hearing officers and the provision of counsel through CalPAP") would certainly interfere with the system of due process review envisioned by the state.

The court acknowledges that immense resources have been devoted to this case, and that it is well-settled that "[o]nce a defendant has engaged in conduct the plaintiff contends is unlawful and the courts have devoted resources to determining the dispute, there is Article III jurisdiction to decide the case as long as 'the parties [do not] plainly lack a continuing interest....'" *Demery v. Arpaio,* 378 F.3d 1020, 1026 (9th Cir.2004) (quoting *Friends of the Earth,* 528 U.S. at 192, 120 S.Ct. 693). But it is the court's considered judgment that California's new parole revocation system is so substantially different from the prior system that neither party retains any continuing interest. In bringing this action, plaintiffs sought to safeguard their due process rights in an administrative system; defendants were the parties responsible for that system's functioning. The post-Realignment parole revocation system involves a complex interplay between the state's executive and judicial branches, as well as county authorities. Acknowledging that "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available, the question is whether there can be any effective relief," *Gordon,* 849 F.2d at 1245, it does not appear to the court that continued enforcement of the Injunction can provide "any effective relief" for plaintiffs. While plaintiffs retain a continuing interest in safeguarding their constitutional rights, the functioning of the system has changed to such a degree that *Valdivia* no longer provides a viable means for providing those safeguards.

None of this is to say that the constitutionality of the new parole system is immune from challenge. It may well be, *e.g.,* that DAPO's probable cause "determinations" represent a "rever[sion] to a wholly internal review process for assessing probable cause" (Plaintiffs' Opening 22) of the type that this court found unconstitutional in 2002. Nevertheless, for the reasons set forth above, any such infirmities will have to be addressed, if at all, in a subsequent lawsuit or lawsuits.

## B. Plaintiffs' remaining arguments

■ Plaintiffs make a number of fact-specific arguments for why the court should continue to exercise jurisdiction over this case, as follows:

- The vast majority of cases will be resolved by DAPO without ever proceeding to final revocation hearings in the state court, thereby depriving plaintiffs of due process protections. (Plaintiffs' Opening 1–2, 5.) This argument rests on the Special Master's finding that, of late, 94% of parole revocation cases have resolved prior to any final revocation hearing. (*Id.* 9.)

- Despite defendants' averments that they do not intend to deploy flash incarceration, plaintiffs offer evidence suggesting that DAPO not only can, but will, "flash incarcerate" parolees. This evidence includes draft CDCR documents describing and authorizing the use of this sanction, as well as the fact that the state's new Parole Violation Disposition Tracking System software captures data regarding flash incarceration

These dangers are, at this point, entirely speculative, and as such, implicate both mootness and ripeness concerns. To present a continuing case or controversy, the threat of injury must be "real and immediate," not "conjectural" or "hypothetical." *Lyons*, 461 U.S. at 102, 103 S.Ct. 1660 (1983). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated,

or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)). No one can yet know how the post-Realignment parole revocation system will function in practice. One cannot infer from the relatively small number of cases proceeding to revocation hearings before BPH under the old system that similarly small numbers will proceed to hearings before the courts under the new system. Moreover, plaintiffs' argument is premised on the assumption that the new system will not provide adequate due process protections prior to final revocation hearings, a finding the court explicitly declines to make. Similarly, regardless of whether DAPO is prevaricating in its claim that it will not use flash incarceration, it would be premature for the court to rule on the measure's constitutionality, both because it is a single element of a complex new system and because its use by DAPO "may not occur at all." *Texas*, 523 U.S. at 300, 118 S.Ct. 1257.

Next, plaintiffs argue that defendants have failed to present "sufficient evidence for the Court to determine whether modification or termination of the remedy, or any parts of it, would 'create or perpetuate a constitutional violation.'" (Plaintiffs' Reply 14 (citing *Rufo*, 502 U.S. at 391, 112 S.Ct. 748)). Plaintiffs miss the point that, as of July 1, 2013, the court no longer has jurisdiction to determine whether there is an ongoing constitutional violation in this matter. The court has reached that conclusion based on the statutory scheme enacted by the California legislature,[12] not on

---

12. This is not to say that the court has no concerns about the new system. Under the post-Realignment system, it appears entirely possible for a parolee to be detained for an indefinite period of time, without notice of charges or a probable cause hearing, before DAPO finally files a petition for parole revoca-

tion with the state court. An indeterminate interval may again pass before the state court holds a revocation hearing. In the meantime, the parolee may have lost custody of his children, his job, his home and/or his car. The parolee will have no redress if the state court

the basis of factual evidence adduced by the parties. Again, it is the court's view that any constitutional infirmities of the post-Realignment parole revocation system must be addressed in subsequent litigation.

Finally, there is the matter of plaintiffs' supplemental reply to the court's May 6, 2013 Order, filed on June 27, 2013. (ECF Nos. 1841, 1842.) The parties should note that, in general, the court disapproves of the filing of supplemental briefing without leave. Plaintiffs could have sought leave, and in so doing, apprised the court and defendants of the relevant issues; if the court found the issues raised to be meritorious, it would have then set an appropriate briefing schedule. The parties are cautioned that failure to follow these steps in the future may be grounds for sanctions.

Plaintiffs' supplemental reply raises the issue of how the state will handle parole supervision and revocation for those inmates due to be released from state prison pursuant to the June 20, 2013 Order of the Three Judge Court in *Coleman v. Brown,* No. 2:90–cv–0520–LKK–JFM (E.D.Cal.) (ECF No. 4662) and *Plata v. Brown,* No. 3:01–01351–TEH (N.D.Cal.) (ECF No. 2659). Plaintiffs contend:

> [A]ssuming the defendants do not disregard the Court's June 20 Order in the *Plata/Coleman* matter, more than 5,000 class members will be released on parole between now and the end of 2013, and they will not be subject to Realignment processes. Rather, they will be supervised by the *Valdivia* defendants—and not by the counties. And they will be returned to state prison—and not to county jail—upon a finding that their conditions of parole were violated. The state courts have no jurisdiction under

> A.B. 109 and its clean-up bills to return a person to state prison for a parole violation. See Cal.Penal Code § 3000.08(f, g) (version operative July 1, 2013). The anticipated process, therefore, must be within the CDCR and/or Board of Parole Hearings. These class members, therefore, will be subject to revocation proceedings and hearings by the *Valdivia* defendants—and not by the state courts. (ECF No. 1841.)

Fortuitously, at the time that plaintiffs' filed their supplemental briefing, the court was conducting a bench trial in the matter of *Gilman v. Brown,* No. 2:05–cv–830–LKK–CKD (E.D.Cal.). On Monday, July 1, 2013, Jennifer Shaffer, the Executive Officer of BPH, was called as a witness in that trial. After she was sworn in, the court asked Ms. Shaffer whether parole violations among those inmates released pursuant to the Order of the Three Judge Court would be handled under the prior parole revocation system, or the current one. Ms. Shaffer responded that, according to her understanding, petitions to revoke these inmates' parole would be filed with the state courts, which would then handle them. It is evident that, by virtue of her position, Ms. Shaffer is in a position to testify competently regarding BPH's responsibilities. Moreover, she testified under oath. For the reasons set forth above, this court has already determined that state court jurisdiction over parole revocation hearings is sufficient to moot this case. Accordingly, based on Ms. Shaffer's testimony, the court finds that the contentions raised by plaintiffs' supplemental briefing provide an inadequate basis for the court's continued exercise of jurisdiction over this matter. In other words, *Valdivia* is moot.

---

ultimately finds that there was no basis for revoking parole. Despite the probable unconstitutionality of such procedures, these harms

remain hypothetical, not actual, and as such, may not be addressed in this action.

## IV. CONCLUSION

The court hereby orders as follows:

■ The court FINDS that this case is moot. Accordingly, the court DECLINES to adopt the Thirteenth Report of the Special Master on the Status of Conditions of the Remedial Order (ECF No. 1783.) A forthcoming order will address the parties' outstanding requests to seal documents.

■ The parties and the Special Master are DIRECTED to file final motions, if any, for fees and costs within twenty-eight (28) days of the date of entry of this order. Upon resolution of these motions, the court will decertify the class and dismiss this case.

IT IS SO ORDERED.

### ORDER

Pending before the court is plaintiffs' motion for reconsideration of the court's July 2, 2013 order finding this case moot. (Plaintiffs' Motion for Reconsideration ("Motion"), ECF No. 1849; Order, July 2, 2013 ("July 2 Order"), ECF No. 1845.) The court previously took this motion under submission. Plaintiffs' arguments are considered in turn; for the reasons set forth below, their motion will be granted in part and denied in part.

## I. STANDARD

Plaintiffs seek reconsideration under Federal Rule of Civil Procedure 60(b), subsections (1) and (6).

■ Rule 60(b)(1) allows for relief from an order for "mistake, inadvertence, surprise, or excusable neglect." Plaintiffs seek reconsideration on the basis of mistake. Errors of law may be corrected by the district court under this subsection. *Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir.1982).

■ Rule 60(b)(6) allows for relief from an order for "any other reason that justi-

fies relief." Extraordinary circumstances are required to justify relief under this portion of the rule. *See Ackermann v. U.S.*, 340 U.S. 193, 202, 71 S.Ct. 209, 95 L.Ed. 207 (1950) ("Neither the circumstances of petitioner nor his excuse for not appealing is so extraordinary as to bring him within ... Rule 60(b)(6)."); *see also* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2857 (3d ed. 2013) (" '[E]xtraordinary circumstances' should only be required under catchall clause (6) of the rule.").

## II. ANALYSIS

### A. Alleged error in finding mootness

Plaintiffs' central argument is that this court erroneously "re-defined" the parole revocation process as beginning only when a petition for parole revocation is filed with the state court, rather than when a parolee is detained for suspected parole violations. Plaintiffs argue that, as a matter of law, "the parole revocation process begins, for the purposes of constitutional analysis, when a parolee is arrested and incarcerated for allegedly violating parole." (Motion 6.) In support of their argument, plaintiffs make much of the following sentence in the July 2 Order:

> [The California Department of Corrections and Rehabilitation's ("CDCR") Division of Adult Parole Operations ("DAPO") ] initiates the parole revocation process by filing a petition with the state court, which must include "a written report that contains additional information regarding the petition, including the relevant terms and conditions of parole, the circumstances of the alleged underlying violation, the history and background of the parolee, and any recommendations." (Order 13.)

Plaintiffs assert that, "[i]n light of DAPO's continuing (even expanded) role in parole revocations, it was a mistake for this Court

to find that 'parole revocation process' begins only after DAPO files a petition with the state courts." (Motion 7.)

To be clear, this court has never found, nor is it of the view, that the parole revocation process begins only when a parole revocation petition is filed with the state court. California Penal Code section 3000.08(f) provides, in pertinent part, that "[i]f the supervising parole agency has determined, following application of its assessment processes, that intermediate sanctions ... are not appropriate, the supervising parole agency shall ... petition [the appropriate state court] **to revoke parole**" (emphasis added). It was in reference to the text of this provision that the court used the phrase "initiates the parole revocation process" in the sentence, quoted above, that is relied upon by plaintiffs as evidence of this court's purported error.

■ It is of course well-settled that, as a matter of law, an individual is constitutionally entitled to due process protections from the moment that he or she is arrested on a suspected parole violation. *See Morrissey v. Brewer*, 408 U.S. 471, 485, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("In analyzing what [process] is due, we see two important stages in the typical process of parole revocation ... The first stage occurs when the parolee is arrested and detained ... The second occurs when parole is formally revoked.").

But, as discussed at length in the July 2 Order, California has, in enacting Realignment, created a new system for handling both stages of the parole revocation process. Any Constitutional infirmities must be addressed by considering the new system's functioning as an organic whole. The fact that the *Valdivia* defendants play significant roles in the post-Realignment system is insufficient to justify the court's continued exercise of jurisdiction over the defendants, as plaintiffs desire.

Plaintiffs point to the fact that, under section 3000.08, "a parolee may waive, in writing, his or her right to counsel, admit the parole violation, waive a court hearing, and accept [a] proposed parole modification or revocation" prior to the filing of a revocation petition with the state court. (Motion 7.) Plaintiffs contend that the ability "to present 'screening offers' and to take uncontested waivers of rights *prior* to the filing of any petition with the state court ... was a central feature of the system that existed prior to the *Valdivia* Injunction." (Motion 7.) That may very well be true. Nevertheless, California must be given an opportunity to operate its "Realigned" parole revocation system without premature interference by federal courts. If, in practice, it turns out that CDCR, the state courts, and parolees' defense attorneys prove incapable of safeguarding the due process rights of suspected parole violators at any stage in this new system, then the system may again be challenged as unconstitutional. But to implement the remedy proposed by plaintiffs—the establishment of an eight-month-long "transition period," in which DAPO is required to provide parolees with notices of charges and rights within 3 days, and to file violation petitions with state courts within 7 days, and in which monitoring by the parties and the Special Master will be ongoing for at least the first six months—is to presume *ex ante* that the "Realigned" parole revocation system will fail to provide parolees with due process safeguards absent significant judicial intervention. The court declines to make such a presumption. Plaintiffs' motion on this ground is therefore denied.

**B. Persons arrested before July 1, 2013 for alleged parole violations**

■ Plaintiffs argue that the injunctive relief previously ordered in this matter ("*Valdivia* Injunction") ought to remain in

effect for those alleged parole violators who were arrested prior to July 1, 2013, but whose revocation hearings have not yet been adjudicated by the Board of Parole Hearings ("BPH"). Plaintiffs are also correct that defendants's opposition includes "no evidence that the hearings scheduled for the days up to and including July 26 [*i.e.,* the date on which defendants earlier stated that the last parole revocation hearing was scheduled to occur] actually happened, and no evidence concerning the number of pre-July 1 arrestees still in custody but unrevoked." (Reply 8.) The court agrees that *Valdivia* is not moot as to these individuals, and will modify its July 2 Order accordingly.

However, the court declines to go as far as to order that the *Valdivia* Injunction be maintained "until the last of the pre-July 1, 2013 [*sic*] has been released from any custody imposed as a result of the parolees arrested pre-July 1 parole violation charges." (Motion 18.) Plaintiffs' counsel argues that their ethical obligation to parolees in custody "persist until every parolee is released at the end of his or her revocation term." (Reply 9.) According to plaintiffs' counsel, they have "notified Defendants of over-detention problems in County Jails in recent weeks and months. Dismissing the case now would remove that avenue of recourse for the thousands of parolees now in custody, serving revocation terms which may last beyond the end of 2013." (*Id.*) In support, plaintiffs cite to their objections to the Special Master's Thirteenth Report, in which they detailed several instances in which parolees were erroneously detained beyond their scheduled release dates in Alameda, Contra Costa, Fresno, Los Angeles, and San Mateo counties. (*Id.*)

▮ The court is nevertheless unconvinced that the *Valdivia* Injunction must be maintained until the last of the parolees arrested before July 1, 2013 is released from custody, rather than until their alleged parole violations have been disposed of. As defendants argue, "Plaintiffs also fail to explain which provisions of the Injunction would even apply to parolees serving revocation terms as a result of a pre-July 1, 2013 arrest. Indeed, none of the provisions apply. All charges against these parolees have been adjudicated." (Opposition 7.) The principal concern articulated by plaintiffs in their objections to the Special Master's Thirteenth Report are failures of information systems and of interagency communications. It is unclear to the court that maintaining the Injunction in place would remedy these failures, rather than having the opposite effect: increasing errors as the state[1] is forced to keep *Valdivia*-mandated procedures in place for one group of inmates (parolees detained prior to July 1) while implementing new procedures for those parolees detained after July 1.

Accordingly, the *Valdivia* Injunction need only remain in effect until the cases of all persons arrested prior to July 1, 2013 for suspected parole violations are disposed of, whether through revocation hearings, release, or other disposition; it need not remain in effect until all of these persons have been released from custody.

**C. Notice to *Valdivia* class members**

Plaintiffs next raise the issue of notice of termination of this action to the *Valdivia* class members, writing:

> Plaintiffs have come to rely on the *Valdivia* Injunction as a safeguard against overreaching by the State, and to expect that they can report due process violations to counsel, and obtain some measure of relief (*e.g.* [,] through the Paragraph 27 process for reporting indi-

---

1. Not to mention the individual California counties, which are not parties to this lawsuit.

vidual violations of the Injunction). Dismissing the case without notice to the Plaintiff class—who will otherwise experience no change in their everyday circumstances to alert them that the case has ended—would foil those expectations and be ill-suited to the legacy of this case. Without notice that *Valdivia* has been terminated, individual class members risk losing their claims for individual due process violations when the limitations period on those claims expire. [*citation to plaintiff's motion* ] At present, class members rely on *Valdivia* to vindicate their due process rights. [*citation to plaintiff's motion* ] Defendants argue that this risk is insignificant, because the superior courts can hear individual due process claims, [*citation to defendant's opposition* ] But again, the vast majority of parolees will never encounter the superior courts under Realignment—their cases will be resolved during the pre-petition stages of the parole revocation process—with no court involvement. And Defendants' analogy ignores the fact that the *Valdivia* Injunction's remedies exist apart from, and in addition to, the opportunity to raise objections during parole proceedings. Class members should be told that those remedies no longer exist, and that their only recourse for violations of their rights prepetition is to file an individual civil suit or petition for habeas corpus. (Reply 12–13.)

Plaintiffs "request that the court stay final judgment in this matter to allow for a notice and comment period under Rule 23(d)(1)(B), direct the parties to submit a stipulated proposed form of notice, and establish a schedule for the Court to receive objections and to hold a fairness hearing before any final judgment issues." (Motion 22.)

The court sees no reason to receive objections and hold a fairness hearing as to the propriety of decertification of the *Val-*

*divia* class and termination of this action. The mootness of this case is settled as a matter of law. Consequently, any objections that plaintiffs may raise at a fairness hearing are simply beside the point. As defendants point out, "There are no individual, factual issues that bear on the question of mootness." (Opposition 16.)

Nevertheless, plaintiffs are correct as to the importance and appropriateness of providing notice of termination to the plaintiff class. Rule 23(d) permits the court to issue orders that "require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of . . . any step in the action." Fed.R.Civ.P. 23(d)(1)(B)(ii).

Plaintiffs argue that the costs of any notice should be assigned to defendants, writing:

> Plaintiffs are a largely indigent class of 60,000 parolees in custody and not in custody, scattered throughout the state of California. Their positions were vindicated in this lawsuit in [myriad ways], and Defendants have the means to finance a relatively modest means of notice. . . . Assigning the cost of notice to Defendants also promotes efficiency. Defendants keep information concerning the location of all parolee[s] in centralized databases; Plaintiffs' counsel does not. For the roughly 8% of the Plaintiff class with pending revocation charges . . . Defendants have the ability to personally serving [*sic* ] on parolees in the "notice" stage of the revocation process, which Plaintiffs' counsel lacks. The remainder of the class is supervised by defendant DAPO on parole and can receive notice by posting in parole offices and by communication (mail or in person) with their parole agents . . . [Plaintiff's] counsel stands to lose access to their clients once the case is dismissed.

Many County Jails, for example, restrict legal visits to a parolee's current counsel. (Reply 14.)

Defendants disagree, citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (finding that district court erred in dividing costs of notice of class certification between the parties) for the proposition that "the responsibility and cost for [providing notice] should be borne by Plaintiffs." (Opposition 16.) *Eisen* is easily distinguished, however, because it concerned the question of which side should pay for the costs of notifying potential class members of class certification, a question the Supreme Court found to be unambiguously decided by the text of Rule 23. The issue presently before this court is who should bear the costs of notifying the class of *Valdivia's* dismissal on mootness grounds.

In deciding this question, the court is also guided by California Rule of Professional Conduct 3–500: "A member shall keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed." Class counsel bears an ethical responsibility to notify the *Valdivia* class members of the action's dismissal.

In light of the foregoing, it appears that the best course of action is to require the parties to share the costs of notice, in the manner set forth in the court's order below.

## D. Alleged error in taking evidence

Plaintiffs argue that the court erred in taking testimony from BPH's Executive Officer regarding how the state intends to handle parole supervision and revocation for those inmates who will be released from prison pursuant to the order of the Three Judge Court in *Coleman v. Brown,* No. 2:90–cv–0520–LKK–JFM (E.D.Cal.) and *Plata v. Brown,* No. 3:01–01351–TEH (N.D.Cal.). Plaintiffs argue that "[a]llowing for an eight-month transition period would relieve the parties and the Court from relying on predictions about how this new group of parolees will be handled, and will allow the Court to tailor relief as necessary in the event that these parolees are put through administrative rather than judicial revocation processes." (Motion 18)

As explained above, the court declines to maintain the *Valdivia* Injunction as a prophylactic remedy, for to do so would be to presume the constitutional unfitness of California's new parole system. The court is even less willing to maintain the Injunction in place based on the possibility that prisoners subject to early release might be placed solely under defendants' administrative supervision. Any Constitutional infirmities in the handling of parole for these inmates will have to be addressed in a separate proceeding.

Accordingly, plaintiffs' motion for reconsideration on this ground is denied.

## E. Abstention

Plaintiffs argue at length that the court "misapprehended" the abstention doctrine set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, and argue for reconsideration on the grounds that abstention doctrines do not provide a basis for dismissal herein.

In so arguing, plaintiffs misconstrue the substance of the court's July 2 Order. Abstention was not the basis for dismissal; mootness was. The sole paragraph in the order to reference abstention provided that "[a]bstention from unwarranted interference with state court proceedings is a well-settled principle," and concluded, "For this court to, *e.g.,* require defendants to maintain the current system for provid-

ing parolees with probable cause hearings (including, as plaintiffs request, 'the BPH system of hearing officers and the provision of counsel through CalPAP') would certainly interfere with the system of due process review envisioned by the state." (July 2 Order 24–25.) In making their argument, plaintiffs have significantly misconstrued a passing observation (that dismissal of this case is supported by abstention/federalism principles) for a legal justification (that dismissal is required under *Younger* abstention). Mootness is a sufficient basis for dismissal, and that determination would be undisturbed by a full-blown *Younger* analysis. Reconsideration on these grounds is therefore denied.

## III. CONCLUSION

The court hereby orders as follows:

■ Defendants are DIRECTED to maintain the injunctive relief previously ordered in this matter in place for those alleged parole violators who were arrested prior to July 1, 2013, but whose alleged parole violations have not yet been addressed by defendants. Defendants are FURTHER DIRECTED to file a declaration no later than October 1, 2013 apprising the court as to the status of these alleged parole violators' cases, and to continue doing so on the first of each month thereafter, until all of the outstanding cases have been disposed of. Thereafter, the court will resolve the outstanding motions for fees and costs, decertify the class, and dismiss this case.

■ Plaintiffs' counsel and defendants are to provide notice of dismissal of this action to class members, using the following procedures:

1. The parties are to agree on the form of notice.
2. Defendants will provide plaintiffs' counsel with the last known mailing address for each individual in the plaintiff class, whether incarcerated or not, in an electronic form conducive to the printing of mailing address labels. Defendants will bear the costs of collecting this information and providing it to plaintiffs' counsel.
3. Plaintiffs' counsel will mail a copy of the agreed—upon notice to each class member, using the address provided by defendants. Plaintiffs' counsel will bear the costs of printing and mailing these notices.
4. Defendants will cause large, easily-readable copies of the agreed-upon notice to be placed in easily visible locations in every parole office in the state. Defendants will bear the costs of printing these notices and causing them to be posted.

The parties are DIRECTED to complete the steps above no later than thirty (30) days after entry of this order. ■ Plaintiff's request for reconsideration of the court's prior order finding this case moot is DENIED in all other respects.

IT IS SO ORDERED.